# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

JOHNNY WATTS,

      Petitioner,

v.                                         Case No. 09-CV-0652
                                                      (03-CR-278)

UNITED STATES OF AMERICA,

      Respondent.

_____

## ORDER

On July 2, 2009, Johnny Watts ("Watts"), a federal prisoner, moved this court to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. (Docket #1). Watts alleges that his court-appointed attorney, Allan Krezminski ("Krezminski") rendered ineffective assistance during various stages of Watts' criminal case resulting in the petitioner receiving a longer sentence than he thinks was appropriate. Upon reviewing the voluminous record and the briefs submitted by both sides, the court will deny Watts' motion. Before resolving the various arguments proffered by Watts in his briefs to the court, a recounting of the facts propelling this litigation is warranted.

## FACTUAL BACKGROUND

In July of 2001, while dining in a restaurant in Riverside, California, a friend of the petitioner introduced Watts, a California resident, to Gene Vaughn ("Vaughn"), a Wisconsin resident who was visiting southern California. In a brief, yet fateful conversation, Vaughn boasted about his criminal exploits. Specifically, the

Wisconsin man informed Watts about a scheme where Vaughn, with the help of several cohorts, would steal United States Treasury checks, such as tax refund checks issued by the Internal Revenue Service or monthly Social Security benefit checks, from postal facilities in California and deposit the stolen checks into a checking account under the fictitious name of "EZ Check Cashing" at the Wells Fargo Bank in Milwaukee. From those accounts, Vaughn distributed the proceeds from his scheme to himself and other co-conspirators. Intrigued by Vaughn's disclosures, Watts informed his new acquaintance that he had recently acquired a hoard of Treasury checks that he was unable to sell. After exchanging phone numbers, Watts promised Vaughn that he would call the Wisconsin resident as soon as he acquired more Treasury checks. True to his word, a week later, the petitioner contacted his new friend, and informed Vaughn that a new batch of checks had come into Watts' possession. Vaughn proposed that he and Watts split the proceeds of the checks "50/50," and the petitioner readily agreed.

By the end of July 2001, Watts sent his first batch of stolen Treasury checks to Vaughn, and Vaughn deposited the proceeds of the checks into the EZ Check Cashing account. To ensure that Watts obtained his share of the proceeds from the scheme, the petitioner, using a false social security number and a phony driver's license, opened a Wells Fargo account in Los Angeles and gave the account number to Vaughn such that Vaughn could make deposits from the EZ Check Cashing account directly into Watts' account. By the end of September, Vaughn had deposited over $60,000 into Watts' account. Wells Fargo, suspecting fraudulent

-2-
Case 2:09-cv-00652-JPS   Filed 03/02/10   Page 2 of 12   Document 21

activity, closed both the EZ Check Cashing account and Watts' account in the fall of 2001.

Watts' and Vaughn's scheme did not end that year, however. After Wells Fargo shut down the EZ Check Cashing account, Vaughn created a new account at the same bank under the name of "Tax Returns by Redd." Between November 2001 and April 2002, Watts sent Vaughn more stolen Treasury checks. Simultaneously, the petitioner induced his wife, Cheryl Watts, to, using a false social security number, address, and driver's license, open a new Wells Fargo account such that Vaughn could continue to directly deposit Watts' cut from the scheme into Cheryl Watts' account.[1] In April of 2002, Wells Fargo got wise to the scheme and closed Vaughn's latest account. "Once bitten, twice shy," Watts ceased sending checks to Vaughn. However, by April 2002, Watts had already provided Vaughn with checks totally more than $135,000, amassing a tidy sum of $67,550 for Watts.

On March 23, 2004, a federal grand jury in Milwaukee returned an indictment against Watts, charging him with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). A little over a month later, on April 30, 2004, Watts was arrested in California. At his arraignment in federal court in California, his attorney, a California federal public defender, based on information relayed from Watts, informed the court that the petitioner was residing with his

---

[1] While no funds were actually transferred from Vaughn's "Tax Returns by Redd" account into Cheryl Watts' account, it was not for lack of trying. In April 2002, Vaughn attempted to make a deposit into Cheryl Watts' account but, because Vaughn had written the wrong number on the deposit slip, his attempt failed.

cousin "Enise Jenkins." Watts repeated his supposed living arrangement to pretrial services during an interview. The petitioner also signed and dated a Central District of California Release Order and Bond Form, listing his address as 4282 Baggett Drive, Riverside, California. The United States District Court for the Central District of California set Johnny Watts' bail at $75,000, which was to be paid by "deeding of property by Enise Jenkins." On May 11, 2004, an affidavit of surety was filed with the federal court reporting, under penalty of perjury, that Enise Jenkins was the "sole holder or owner" of the property in question and that the property's value exceeded the bond amount. The court received a certified copy of the deed for the 4282 Baggett Drive property in July of 2004, listing the owner as Enise Jenkins. The government soon discovered, however, that "Enise Jenkins" was merely an alias used by Cheryl Watts.[2] Apparently, Watts' wife posted the surety bond under the fake name in order to conceal the fact that the petitioner had an ownership interest in the property, which prevented the property from being subject to forfeiture. At a hearing on March 13, 2005, the petitioner admitted that he "basically own[ed] the house," and Magistrate Judge Patricia J. Gorence granted the government's motion to revoke Watts' bond, requiring that Watts be detained pending trial.

Watts' trial occurred in early July of 2005. At trial, the United States presented evidence which included: (1) postal records demonstrating that packages were sent

---

[2] Watts contends that "Enise Jenkins" was not an "alias," as his wife's maiden name was "Cheryl Enise Jenkins." While the name chosen by Cheryl Watts may not have been particularly creative, the evidence overwhelmingly shows that the name "Enise Jenkins" was an alias. *See Random House Dictionary*, Alias- 8 dictionary results, http://dictionary.reference.com/browse/alias (defining "alias" as "a false name used to conceal one's identity; an assumed name") (last visited February 23, 2010).

from an address associated with Watts to Vaughn; (2) checks issued from Vaughn to "C. Watts"; (3) three witnesses who identified Watts as the owner of the mailboxes whose addresses were used in the scheme; and (4) Watts' fingerprint on a mailing that was used in the conspiracy. Following the three-day trial, a jury found Watts guilty of conspiring to transport stolen Treasury checks, commit bank fraud, and commit money laundering in violation of federal law. One month later, on August 9, 2005, the court entered a preliminary order of forfeiture against the petitioner, imposing a money judgment in the amount of $135,100, that was eventually satisfied through the forfeiture of Watts' residence in Riverside, California. On November 22, 2005, this court sentenced Watts to sixty months of imprisonment on the conspiracy to commit fraud charge and eighty-six months of imprisonment on the conspiracy to commit money laundering charge, with the terms running concurrently, followed by three years of supervised release. The court, in determining Watts' sentence, imposed an enhancement for obstruction of justice based on Watts' influencing his wife to post the surety bond under false pretenses. On July 25, 2008, the Seventh Circuit affirmed Watts' conviction. (*U.S. v. Watts*, 535 F.3d 650). Less than a year later, Watts moved, under 28 U.S.C. § 2255, to vacate his sentence. (Docket #1). With the matter fully briefed, the court now proceeds to discuss the merits of Watts' motion.

## DISCUSSION

28 U.S.C. § 2255 allows "a prisoner in custody under sentence of a court established by Act of Congress" to "move the court which imposed the sentence to

-5-

vacate, set aside or correct the sentence" if the prisoner believes his or her sentence was "imposed in violation of the Constitution or laws of the United States." The court can dismiss the motion without a hearing if the "files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Here, Watts argues that the court should "vacate, set aide or correct" his sentence because the petitioner was denied the right of effective assistance of counsel during his criminal proceedings as guaranteed by the Sixth Amendment to the United States Constitution.

The Sixth Amendment to the Constitution affords criminal defendants the right to effective assistance of counsel. *Watson v. Anglin,* 560 F.3d 687, 690 (7th Cir. 2009). To successfully prove a denial of effective assistance, a prisoner must prove: (1) that his or her attorney's performance fell below an objective standard of reasonableness; and (2) he or she suffered prejudice as a result. *Strickland v. Washington,* 466 U.S. 668, 687-88, 693 (1984). To satisfy the first prong of the *Strickland* test, the plaintiff must direct the court to specific acts or omissions of his counsel. *Fountain v. United States*, 211 F.3d 429, 434 (7th Cir. 2000) (internal citations omitted). Self-serving and unsupported assertions will not suffice to meet the petitioner's initial burden. *United States v. Messino*, 55 F.3d 1241, 1253 (7th Cir. 1995); *see also Barkauskas v. Lane*, 946 F.2d 1292, 1295 (7th Cir. 1991) ("Looking . . . at authority considering the requirement of a showing of prejudice in a claim of ineffective assistance of counsel, the party must present evidence, not mere conclusory allegations.") The Court must then consider whether, in light of all of the

circumstances, counsel's performance was outside the range of professionally competent assistance. *United States v. Banks*, 405 F.3d 559, 569 (7th Cir. 2005). The court's review of the counsel's performance must be "highly deferential . . . indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. To satisfy the latter prong of the *Strickland* test, the petitioner must show that there is a "reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *United States v. Williams,* 106 F.3d 1362, 1367 (7th Cir. 1997). "A reasonable probability is defined as one that is sufficient to undermine confidence in an outcome." *Adams v. Bertrand*, 453 F.3d 428, 435 (7th Cir. 2006). A court need not address both prongs of the *Strickland* test if one provides the answer; if a court determines that the alleged deficiency did not prejudice the defendant, the court need not consider the first prong. *United States v. Fudge*, 325 F.3d 910, 924 (7th Cir. 2003) (internal citations omitted).

Here, Watts proffers three ways in which the assistance of his trial counsel, Attorney Krezminski, was ineffective. First, Watts contends that it was Krezminski, as opposed to the petitioner himself, who "advised [the petitioner's] wife . . . to sign an affidavit of surety in order to satisfy the bond requirement" under the name "Enise Jenkins," allowing for Watts' sentence enhancement for obstruction of justice. (Watts' July 2, 2009 Memo. 20). The petitioner's allegation is a startling claim that, if true, would likely fall outside the range of professionally competent assistance. However, bald allegations of prejudice are insufficient to demonstrate ineffective

assistance of counsel. *Barkauskas,* 946 F.2d at 1295. Here, Watts' asseveration that Krezminski advised the petitioner's wife to lie when she filed the affidavit of surety in the California federal court on May 11, 2004, is devoid of any support in the record and belies basic logic. In fact, Watts' claim borders on the preposterous, as Krezminski, a Wisconsin attorney, was only first appointed to represent Watts on April 12, 2004 (Criminal Docket #108) and only began work on the case in June of 2004, well after Cheryl Watts submitted her affidavit of surety.[3] (Krezminski Aff. ¶ 2). There is nothing in the record to indicate that Krezminski, within weeks of being appointed counsel in the case by Magistrate Judge William Callahan and before talking to the public defender representing his client, opted to fly to California and advise the petitioner's wife to lie on an affidavit to the court such that Watts could avoid incarceration before his trial.[4] Moreover, Watts has already had a hearing regarding who was culpable for causing Cheryl Watts to lie on her affidavit of surety; on May 13, 2005, after an extensive evidentiary hearing, Magistrate Gorence found that Watts caused his wife to post a surety bond under an alias and the false

---

[3] Krezminski states in a sworn affidavit to the court that he began work on the case in June of 2004 by talking with Watts' public defender who was aiding the petitioner in his hearing in federal court in California. The court notes that the petitioner does not allege that members of the Los Angeles federal defender's office lured Watts or his wife into posting the false bond papers. However, even if the petitioner were to make that argument, nothing in the record indicates that the California federal defenders had any knowledge of who signed the affidavit of surety as "Enise Jenkins." In fact, Watts' counsel at his April 30, 2004 arraignment, Liliana Coronado, indicated to the court that the petitioner had told her that he was living with his cousin Enise Jenkins. Moreover, at the same time, the petition made a similar claim to pretrial services. The record overwhelmingly demonstrates that Watts was the person propelling the scheme to have his wife, posing as Watts' cousin, file a false affidavit of surety.

[4] The court, while bemused by Watts' story, finds that it makes little sense that Attorney Krezminski, in his first tactical move in his representation of his client, would engage in such a reckless and senseless move. Rather, the far more logical conclusion, and the only conclusion supported by evidence in the record, is that the petitioner, rather than his attorney, encouraged his wife to lie in her affidavit of surety to avoid having his home be subject to criminal forfeiture.

-8-

pretense that she was Watts' cousin, forcing the petitioner to be detained before trial. (May 13, 2005 Tr. 110-112). The petitioner's bare assertions do not provide this court with an adequate basis to second guess Magistrate Gorence's conclusions.

Watts argues that an evidentiary hearing is necessary to determine whether or not Krezminski "advised [the petitioner's] wife to sign an affidavit of surety in the name of Enise Jenkins and whether or not [the petitioner's] counsel advised the wife to state she was the cousin of [the petitioner] instead of his wife." (Pet'r's Reply Br. 1). While a petitioner is entitled to an evidentiary hearing under 28 U.S.C. § 2255(b) if he or she has alleged facts that, if proven, would entitle the petitioner to relief, *see Sandoval v. United States*, 574 F.3d 847, 850 (7th Cir. 2009), and while "ineffective-assistance claims often require an evidentiary hearing because they frequently allege facts that the record does not fully disclose," *Osagiede v. United States,* 543 F.3d 399, 408 (7th Cir. 2008), evidentiary hearings "are not granted as a matter of course in § 2255 proceedings." *Arroyo v. United States*, No. 07-CR-52, 2009 U.S. Dist. LEXIS 86545, at *9 (E.D. Wis. Sept. 1, 2009). In order to obtain a hearing, a § 2255 motion must be accompanied by a "detailed and specific affidavit" which shows that the petitioner has genuine proof to support his or her allegations. *Prewitt v. United States*, 83 F.3d 812, 819 (7th Cir. 1996). A hearing is not required if the petitioner makes conclusory or speculative allegations rather than specific factual allegations. *Gallo-Vasquez v. United States*, 402 F.3d 793, 797 (7th Cir. 2005); *see also Aleman v. United States*, 878 F.2d 1009, 1012 (7th Cir. 1989) ("Mere unsupported allegations cannot support a petitioner's request for a hearing.") Here,

-9-

Watts' allegations regarding Krezminski's influence on the filing of the false affidavit of surety are unsupported and do not warrant holding an evidentiary hearing.

Watts' second contention for why he was denied his Sixth Amendment right to effective assistance of counsel is that his attorney rendered ineffective assistance by failing to request a change of the venue of Watts' trial from Wisconsin to California. Even assuming that Watts' trial counsel erred by failing to request a change of venue,[5] Watts' second argument fails to satisfy the prejudice prong of the *Strickland* test. The petitioner has the burden of showing "with a reasonable probability" that the result of his trial would have been different "but for [his] counsel's unprofessional errors." *United States v. Stark*, 507 F.3d 512 (7th Cir. 2007). Watts has presented no evidence that the result of a trial held in federal court in California would have differed from what actually occurred, especially given the wealth of evidence presented by the government that manifested Watts' guilt. As such, Watts' second argument in support of his claim of ineffective assistance from his trial counsel is without merit.

Watts' final specification of his attorney's ineffectiveness is that his attorney erred by failing to argue that Watts' offenses simply involved the "receipt and deposit" of cashier's checks, rather than money laundering, allowing for a

---

[5] The court notes that venue was proper in the Eastern District of Wisconsin, as a conspiracy charge can be prosecuted in any district where any overt act in furtherance of the conspiracy occurred. *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985) ("As long as one overt act in furtherance of the conspiracy is committed in a district, venue is proper there.") Attorney Krezminski states in his affidavit to the court that his decision to not ask for a change of venue was a strategic choice, hoping that having the trial in Wisconsin would make it more difficult for the government to secure the appearances of witnesses who could testify against Watts. (Krezminski Aff. ¶ 11). While Krezminski's strategy ultimately failed, the court cannot conclude that his decision fell "outside the range of professionally competent assistance and that the deficient peformance denied him a fair trial." *Banks,* 405 F.3d at 569.

-10-

heightened sentence. However, here as well, Watts has not met his burden of demonstrating that prejudice occurred because of Krezminski's decision to not pursue the "receipt and deposit" argument.[6] The fact that a jury convicted Watts on count two of his indictment for conspiracy to commit money laundering demonstrates that evidence beyond a reasonable doubt existed showing that Watts was guilty of the more serious money laundering charge. Nothing the petitioner has provided to this court indicates with reasonable probability that "but for" his trial counsel's decision to not pursue a particular argument that the result of his criminal prosecution would have differed. Therefore, the court finds that Watts was not denied his Sixth Amendment right to effective assistance of counsel.

## CERTIFICATE OF APPEALABILITY

Under Rule 11(a) of the Rules Governing Section 2255 Cases, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability under 28 U.S.C. § 2253(c)(2), the applicant must make a "substantial showing of the denial of a constitutional right" by establishing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L.

---

[6] The court makes no formal judgment as to whether Attorney Krezminski's conduct here was unreasonable professional assistance. However, as discussed in the factual background section of this order, Watts' actions involved serious efforts to conceal the true source of money being deposited into the petitioner's or the petitioner's wife's bank account. As the jury's verdict indicated, the evidence showed that Watts engaged in a conspiracy to commit money laundering, and Attorney Krezminski was likely reasonable in concluding that an argument against the weight of the evidence would be fruitless.

Ed. 2d 931 (2003) (internal citations omitted). While Rule 11(a) permits a district court to direct the parties to submit arguments on whether a certificate of appealability should issue, additional argument is not necessary here. Given the record before the court, no reasonable jurist would find it debatable whether this court was correct in its ruling on the present motion. As a consequence, the court must deny a certificate of appealability as to the petitioner's motion.

Accordingly,

**IT IS ORDERED** that the petitioner's motion to vacate, set aside, or correct sentence (Docket #1) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that a certificate of appealability as to the petitioner's motion be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 2nd day of March, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-12-
Case 2:09-cv-00652-JPS   Filed 03/02/10   Page 12 of 12   Document 21